## Louisville Railway Company v. Dott.

(Decided December 18, 1914.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Fourth Division).

1. Street Railroads—Action Against for Personal Injuries—Negligence.—In an action to recover from a street railway company for personal injury received while a passenger upon the company's car by being struck by a missile thrown by one on the outside, the only question is whether there was any evidence of negligence on the part of the company which was the proximate cause of the injury.

2. Street Railroads—Action for Personal Injuries—Instructions.— Where appellee fled from a difficulty and boarded appellant's car, and was afterwards injured by a missile thrown from the outside, it was error for the court to instruct the jury with reference to a renewal of the attack, where there is no evidence of a cessation of the difficulty, but all the evidence shows that the fight was continuous.

3. Carriers—Passengers.—While a carrier must exercise the highest degree of care for the protection of passengers from assaults by fellow passengers, even strangers, it does not follow that it owes obedience to them.

4. Street Railroads—Difficulty Upon—Duty of Company.—Where appellee while waiting on a street corner for appellant's car became engaged in a difficulty, and when the car stopped he boarded the same and paid his fare and was pursued on the car by his assailants, who continued the difficulty by throwing missiles into the car, even if appellant owed appellee the duty of moving its car from the scene of the difficulty it owed the on-coming passengers the duty of holding the car until they were safely aboard, and if there were those on the steps who did not intend to become passengers, it owed them the duty of not starting the car or doing anything to increase their peril.

5. Carriers—Passengers.—A carrier undertakes to carry a passenger to his destination—not to carry him away from his pursuers.

6.    Street Railroads—Passengers.—If in becoming a passenger appellee carried with him additional obligations, he can not burden appellant with them, unless appellant knew of them and accepted him as a passenger notwithstanding.

7.    Street Railroads—Operation—Passengers.—Where by moving the car appellant might have injured a passenger or even an intruder, it cannot be maintained that he is guilty or any wrong or violation of any duty he owed to passengers in so handling his car, and unless he was so guilty they have no right of recovery, although injured during the time.

8.    Street Railroads—Negligence—Passengers.—It is immaterial that passengers requested the conductor to move. his car.    If there was any negligence in failing to move the car, it existed independently of any requests, nor did the requests enhance the degree of it.

9.    Street Railroads—Passengers—Notice.—Where there is no question of notice or knowledge, advice or suggestions from passengers as to what the conductor should or should not do, could not in any way affect the liability, as it could only go to that purpose.

10.    Street Railroads—Peril—Duty to Avert.—Advice, requests or suggestions to those upon whom a duty is imposed, merely go to carry knowledge of the danger, and in cases where one's. peril is seen or notice is given of it, it becomes the duty of those in charge to avert it if possible.

FRANK P. STRAUS and HOWARD B. LEE for appellant.

POPHAM, TRUSTY & ROOSE for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

The appellee had just become a passenger on one of appellant's street cars in the City of Louisville, when someone outside, unknown to him, threw a brick or piece of ice into the car that struck him in the face, breaking his jaw bone, and causing very painful and permanent injuries. He sued to recover $10,000 general damages, and $1,329 special damages for loss of time and expense of surgical treatment. He recovered a verdict for $5,200 and the street railway company appeals. As we view the case, the only question is whether there was any evidence of negligence on the part of the appellant, which was the proximate cause of the injury.

About ten o'clock one night in January, 1912, the appellee, Dott, whom we shall refer to as the plaintiff, was standing at the corner of . Preston and Chestnut streets, waiting for a car. Mr. Robbins, Mr. Baldes, and Mr. Ochsenhirt, a mail carrier, were also waiting at that corner for the same purpose. While so waiting, three

rowdies passed, and one jostled against the mail carrier. When he warned them to be careful, they came back and got into a fight with him. Of the prospective passengers, the mail carrier was the only one involved in the difficulty, and he seems to have been getting the best of it. About the time the car came, the rowdies took flight, but before the passengers could get aboard, the rowdies with five recruits renewed the attack. The plaintiff had boarded the car, paid his fare, and was standing on the rear platform while the letter carrier and others named were getting aboard. A rowdy on the step at each side of the car was trying to enter, and it seems that others on the outside were throwing missiles aboard. It was during the progress of this fight that some one on the outside threw something through the rear of the car and hit the plaintiff, as above stated. For cause of action, it is contended that the motorman and conductor detained the car an unreasonable length of time, whereas, if they had broken away from the fight, the plaintiff might not have been injured.

After averring that he hailed and boarded the car, paid his fare and became a passenger, the petition states:

"That at said time and place, an altercation and a general fight and disturbance was in progress at said intersection between a number of drunken, rowdy, and boisterous persons, who were creating violent demonstrations, hurling missiles in various directions, and creating danger to plaintiff and other passengers upon said car and to persons generally. He states that said conditions, facts, and dangers were well known to and were observed by the defendant and its agents in charge of said car at said time and that the passengers of defendant on said car at said time requested and implored the agents of defendant in charge of said car at said time to proceed with said car and to move said car from said danger and said scene, and that said agents could have so moved said car from said scene, and from said danger and have prevented any injury to plaintiff by so doing. He states that the defendant and its agents in charge of said car, with gross negligence and carelessness, caused and permitted said car to stand at said scene and in said zone of danger for an unreasonable length of time and negligently and wrongfully failed and refused to start or move said car with reasonable promptness, and regard for the safety of plaintiff and

other passengers, and with further gross negligence and carelessness allowed and permitted certain persons engaged in said fight and altercation whose names are unknown to plaintiff, to throw and hurl particles of bricks and other missiles onto, in and against said car and against this plaintiff and his person, thereby fracturing the right side of his jaw  *  *  *

"Plaintiff states that by the exercise of proper care upon the part of defendant and its agents in charge of said car at said time, said attack upon him could have been prevented and his injury and damage could have been prevented."

As to the fighting on the arrival of the car, we reduce plaintiff's evidence to narrative form. Three young men came along Preston street going north, and they ran into—bumped into Mr. Oschenhirt (the letter carrier), though they had plenty of room. They got into an argument and the fight began. I never had anything to do with the fight at all. They were still fighting when the car came, and I got on the car as quick as I could. Stayed in the rear because people were coming in and out at the time; it was sorter crowded. "Q. How long did the conductor allow that car to stand there? A. Well, I suppose somewhere around three or four minutes, it looked a mighty long time. Q. Did anybody say anything to him during that time? A. Who? Q. The conductor? A. Yes, sir, I told him to ring off several times. Q. Why? A. I knew there was a whole lot of trouble, they were throwing bricks and ice and everything else."

As to when he was struck by the missile plaintiff testified as follows:

"Q. Mr. Dott, had any bricks hit that car or anything before you were hit? A. Well, there was a lot of racket going on there. Q. Well? A. I think so. Q. Did that make much or little noise? A. Well, it was quite an excitement there. Q. Did that make a noise that the conductor did or could hear? A. Certainly he could hear it, everybody in the car heard it. Q. After the car was first hit, did the conductor then move on, or still standing there? A. Still standing there."

On cross-examination the plaintiff testified as follows:

"Q. After the people on the car had gotten off, then you were the first one on the street to get on? A. As soon as I could get on, as soon as it stopped. Q. After

you got on did you say right away to the conductor, 'Pull away from here?' A. No, sir. Q. Was the fighting going on when you stepped on? A. They had to wait until somebody else got on; that man in the fight got on. Q. The letter carrier? A. Yes, sir. Q. And still another man got on? A. Then these fellows came up closer; I said, 'You had better pull the bell.' Q. After the carrier got on, wasn't there a third man got on? A. I don't remember. Q. Wasn't there a man got his hand cut standing there on the corner? A. I don't know; after I was hit I didn't know anything. Q. Before you got hit? A. I could not say. Q. After the letter carrier got on the car, these other men rushed on there after him? A. I suppose so; after I turned my back I don't know what happened. Q. When you got on the car you turned your back to the fight? A. No, sir; it was turned in getting on. Q. Did you see one of those three rowdies as you call them or two of them, get on that car and one of them had a knife? A. One got on, I don't know which one—there was one of them got on. Q. What? A. I think one got on the car. Q. Did you see a man hop on that car immediately behind the letter carrier, with a knife in his hand? A. No, sir. Q. Did you see any one get cut there on the rear platform? A. No, sir; he must have been cut the same time I was hit, I didn't notice that. Q. Did the motorman come back there, that you saw? A. I don't know, he must have come after I was hit.''

As to the hurling of missiles at the car, plaintiff also testified as follows:

''Q. Now, I will ask you if it wasn't one of the men that the conductor put off that car, after he got off he then threw the rock at the letter carrier? A. I didn't see that. Q. How many rocks were thrown there, that you saw? A. How many rocks? Q. Yes, at the street car? A. I didn't see any—just there was a lot of commotion there. Q. A great deal of excitement around there? A. Yes, sir. Q. All the people on the rear platform were disturbed and excited? A. I suppose the whole car of people were disturbed. Q. Did you say anything to the conductor there on that occasion? A. Told him to ring off several times.''

Plaintiff introduced R. C. Kisler, who was a passenger on the front end of the car and testifies as follows:

''Well, the conductor rang twice to go ahead, and gave three bells again, three bells in rapid succession (stop signal). I opened the folding doors, thought

somebody had got throwed off the car; passing on back some one said something about a fight, and when I got about a foot of the back door somebody hit me with a brick; who it was I don't know, and that made me mad. Q. Did that come through the car? A. Yes, sir, it was a brick or a piece of ice; I stood by the money box, and there was a fellow coming on the car with a knife in his hand; he said something to me, he passed some remark, and I kicked him off the car, and another fellow was coming on in the back end and Will Ochsenhirt kicked him off, and they started throwing again, and like here is the money box, Dott was standing over here, like anybody would pay their fare and step aside; he got hurt and he went down to his knees, and I said, 'You stopped something'; he didn't say a word. Q. Did he seem like he would be knocked out, or not? A. You can imagine— yes, sir; one of those fellows started to the front end of the car and I went through and Lucas, the motorman and myself got off. One fellow halloed, 'Don't hit those fellows.' I know that they made several passes at us, Lucas didn't make any pass. I made one. Lucas said, 'Let's get away before they do any more damage.' We got on the front end of the car and Lucas struck his bell twice to go on and the conductor didn't give a signal to go, and then he gave a signal; I don't know how much time elapsed, maybe five or ten seconds elapsed, and we pulled away from there and got to Preston and Breckinridge and we took Baldes off. Q. Do you know how many minutes the car stood there while the fight was going on? A. About three minutes."

Plaintiff introduced B. C. Robbins, who also boarded the car at Preston and Chestnut streets, and testified as follows in regard to the fight:

"Q. What was the first you saw about any trouble? A. The first I saw was the conductor rang the motorman down and gave him three bells, and I supposed that meant trouble some way, so I went back into the car to see what was going on and then when I saw what was going on I came back out on the front end. Q. What was going on back there when you went back? A. There was a bunch of fellows fighting. Q. How were they fighting? A. Throwing bricks and cutting one another. Q. How close were they standing to the street car? A. They were right upon the street car. Q. Can you point out about how many feet it was, if you know? A. No, I never paid that much attention. Q. Was it more or

less than fifteen feet? A. Right up on the street car. Q. Do you mean to say they were on the street car? A. No, sir. Q. Can you tell the jury about how many feet they were away from the street car? A. I could not exactly say, but as I say, they were right up against it. Q. Were they close enough for their missiles and bricks and things to hit the car when they threw them? A. Certainly, could not hardly miss it. Q. How many minutes did the conductor let the car stand there? A. I would judge, for this boy to go back in the car as he did and come back on the front end and the motorman to get off and go back, I would judge about three minutes.''

Samuel Goldsmith, plaintiff's witness, who was also a passenger on the car, testified as follows:

"Q. Did you notice any trouble going on on the street? A. I never noticed any on the street, but on the car. Q. What was the first that attracted your attention? A. Well, one fellow he jumped up and hit another man and another one got hit with a rock or lump of ice, I could not tell what it was. Q. In the car? A. In the car. Q. After you stopped there, could you tell the jury as best you remember, how many minutes if you know, the conductor left the car standing there? A. I said to the conductor myself, 'Ring that bell off,' but he looked like he was kind of amazed, and meantime the motorman thought the conductor was in trouble and he came back on the rear end before I realized what had happened. Q. Could you state how many minutes the street car stayed there? A. I know at least it was over a minute; it was uncalled for. Q. Did you see Mr. Dott get hit? A. I saw him and the same time I never seen it.''

He further testifies as to the occurrence while the car was standing:

"Q. During the minute or two the car stayed there, as you have mentioned, was there anything to keep the conductor from seeing these men fighting and going on? A. No, sir; he was on the rear end of the car, it was right there in front of him. Q. Why was it you had to tell the conductor to ring off and go ahead? A. It looked like this fellow became excited and didn't know what to do; I mentioned it myself, 'Ring your bell off.' Q. Did he still stay there? A. He did, for the motorman to get back to the front before he could go. The motorman thought the conductor was in trouble and came around

the rear end; meantime he goes back on the other end before he rang off, after I mentioned it to him. Q. How long did the car stand there, which made the motorman think he was in trouble? A. Fully a minute after all this thing had happened. Q. Before Dott was hit? A. Yes, sir. Q. Did you hear anybody else trying to get the conductor to ring off and go on? A. Not after I seen this one young fellow was cut and Dott was hit, I became kind of excited myself.''

J. A. Baldes, who also boarded the car with the plaintiff testified for him as follows:

''Q. When the car came up, what about the fight, what was the stage of it? A. They had run—Mr. Ochsenhirt had run them, we thought everything was over and started to get on the car, and I don't know who got on first, I was one of the last ones to get on; we got on and the first I knew, I don't know whether it was a lump of ice or brick went through the window on the back platform. Several of them came, I don't know how many; one of them hit Mr. Dott in the mouth. Q. How many bricks and cakes of ice and things were thrown before he was hit? A. When they came back I judge there was about eight fellows. Q. I wasn't asking about the men; how many bricks and cakes of ice were thrown around the car before Mr. Dott was hit? A. I could not tell you, he got hit by some of the first thrown, I judge.''

As to when the plaintiff was struck and injured he testified as follows:

''Q. Do you know how long it was after Kissler was hit before Dott was hit? A. I could not tell you that, the car went out the street and everything was in commotion.''

William N. Ochsenhirt, who seems to have been the principal figure in the fight, testified for plaintiff as follows:

''Q. What was the first of any trouble that happened, Mr. Ochsenhirt? A. Why, Mr. Dott and Jack Baldes and another boy, I can't think of his name, in fact I don't know who he was, was standing in the crowd with myself, all standing there, when these three young men, I don't know who they were, never seen them before, I don't know whether I could recognize any of them now, they came along and we were talking and waiting for the car, it was an awful cold night, they came along and bumped into us and nearly walked all over us. I said,

"'Why', I said, 'be a little careful where you are going,' and with that they came back and one of them struck at me. At that I struck back, but I am sure I didn't hit him, and with that the three started to throwing ice, and one picked up a board and threw it at me. I raised up my arm and warded off the blow. I picked up the board and threw it back and the three started to run. The car came about that time and all three of us got on the car, and before Mr. Dott said to them, he said, 'Here, why don't you go ahead, don't start any fight' like that. The car came and we got on; as we got on they started to throwing again; he was on the back of the car, the one kicking at me, I kicked back and think he went off the car. Q. How many minutes did the conductor hold the car while the fight was going on. A. Between three and five minutes. Q. And was everybody on the car? A. Yes, sir; the car was crowded. Q. Any reason for him holding it? A. No, there was no reason for him holding it, he could have rang off and went ahead; perhaps Mr. Dott wouldn't have been hit.''

As to when the plaintiff was hit, Ochsenhirt testified as follows:

"Q. When was it Mr. Dott got hit, right after he got on? A. He was on the car possibly two or three minutes. Q. Were you all fighting there on the rear platform two or three minutes? A. Possibly two minutes —Yes, sir, they were kicking me and I kicked back. Q. Was there a man there with a knife? A. Came in the side by the conductor with a knife open, and one came after me, and this man came after Mr. Kissler with the knife and he kicked at him.''

Defendant's witness, B. P. Ferguson, the conductor on the car, gave the following description as to what took place when the car stopped:

"A. When we rolled up to Chestnut street there was some passengers there to get on, and if they were fighting I never saw nothing, then they got on the car, three or four boarded the car; there was three other fellows that started to jump on the car, they were fighting, and I got these fellows off the car that was trying to fight these other fellows and we went on. Q. Was anything thrown at the car while they were fighting on the platform? A. Yes, sir; one of the fellows right back of the car, he picked up a big chunk of ice and throwed it and hit a passenger on the back end of the car. Q. Any other missiles besides the lump of ice thrown? A. No,

sir. Q. I will ask you when you came up there, if the
fighting was going . on, and anything thrown at the
car? A. Nothing thrown at the car at all. Q. What did
yot· do when the fight started on the ˙platform? A.
Trie l to get them to quit and get these fellows off. Q.
Did any one have a weapon in his hand? A. Yes, a.
fellow had ·a knife in his hand. Q. Did you know which
ones wanted to become passengers and which ones were
just getting on to attack them? A. No, sir; when they
went to get on the car I did not. Q. How long did your·
car stand there? A. Not more than I would say a min-
ute or a minute and a half, something like that.''

On cross-examination Ferguson testified as follows:
''Q. You gave an emergency stop after he had al-
ready started once? A. No, sir. Q. What kind was it?˙
A. Gave him one bell. Q. To stop again? A. Yes, sir..
Q. And he did stop? A. Stopped. Q. And you stood
there a couple of minutes these men were fighting? A..
Yes, sir. Q. Why did you stand your car for two min-
utes with this fighting going on? A. Pulled off with
them on the car and they were fighting?''

The motorman on the car, John C. Lucas, gave the·
following description of what he saw:

''Q. Just go ahead and tell what took place. A.
When I was approaching Chestnut, after I crossed Gray
and saw this little commotion, I never thought anything·
about it. I saw these fellows go down that way, and
some women passengers standing on the south side. I
went over and stopped and got the go ahead signal—a
bell—but the same time I got a signal to stop, and some-
body said there was fighting on the back end and opened
the front vestibule door and went back, and as I got to·
the back some fellow swung off the car and struck at
me and just knocked his lick off, and somebody else on·
the street said, 'Don't hit that man.' He said, why did
I butt in and used an oath and I said it didn't make any
difference. I said to the conductor, 'Let's get away as
quick as we can,' and I hopped on the car and went on
˙* * *. Q. About how long, altogether, were you stand-
ing there? A. I suppose not more than two minutes, at
the most.''

The instructions of the court submitted the case in
the following manner:

''If you believe from the evidence that when the car
in question, at the time mentioned, stopped at the south
side of Chestnut street for the ˙purpose of permitting

passengers to alight from said car and persons to board same, a fight occurred on the rear end of said car, being brought about by parties coming from the street renewing an attack on certain passengers on the rear end of said car, and that said parties so boarding said car for the purpose of attack were thrown or kicked off of the car, and that when all the passengers who were destined to said point, and the parties desiring to board same to become passengers, had done so, the parties on the street continued or renewed the attack by throwing missiles against or in said car or at parties thereon, and that thereupon the passengers on said car requested the conductor to ring off the car and allow it to pass on out of danger, and that the conductor and motorman in charge of said car, knew of the conditions existing at the time as above stated and that the passengers were in danger of injury by reason thereof, and had a reasonable time in which to move said car out of danger from said missiles, and failed to do so, but permitted said car to stand in its then position an unreasonable length of time, and that by reason thereof the plaintiff Dott was struck and injured as complained of in his petition, then the law is for the plaintiff, and the jury should so find."

Certainly this instruction was erroneous, because there was no evidence that while the car was stopped there was either a cessation of the difficulty or renewal of the attack. All the evidence makes it clear that the fight was continuous and if there was any difference in the intensity of it, it was at its highest when plaintiff was hit. The passengers, of course, were all excited. The onslaught was sudden and all were fearful for their safety. Some suggested, and others demanded that the conductor ring off, that is, give the motorman orders to start the car, and because he did not obey argument is made that the company is liable. While the carrier must exercise the highest degree of care for the protection of passengers from assault by fellow passengers, even strangers, it does not follow that it owes obedience to them. All the evidence does show, that when the car was rid of the intruders the conductor signaled the motorman to move on, and the motorman did not delay in obeying the signal. When the car stopped, the passengers began to get aboard and the others followed so closely that it was impossible for the conductor to tell one from the other. When it became apparent that their purpose was not lawful, the conductor with the help of

some passengers and·the motorman, who ran back to assist, did their best to expel them, but before this was accomplished the plaintiff had been injured. There is no proof that plaintiff would not have been injured if the car had started. The mere starting of the car would not have prevented the ruffians throwing missiles, and had the conductor started it any time earlier than he did, he would have violated other duties that he owed. With possible passengers hanging on the platform attempting to get aboard—even trespassers—it was the duty of the conductor to either get them safely aboard, if passengers, or expel them, if trespassers, before starting the car. If it owed plaintiff the duty of starting the car, it owed the oncoming passengers the duty of holding the car until they could safely get aboard. There were those on the car steps who it developed did not intend to be-come passengers, in fact they were trespassers. They would have been imperiled by starting the car, and the conductor knowing this, he owed them the duty of not starting the car or doing anything to increase their peril. Neither appellant nor its servants were in anywise responsible for the difficulty. It arose before the car reached there. It did not originate on their property nor were the participants subject to their control. Without their knowledge or consent the difficulty and the participants were transferred to the car. The carrier undertakes to transport a passenger to his destination—not to carry him away from his pursuers. In other words, its business is the carrying of passengers, not fugitives.

It is conceded that the case of Kinney v. L. & N. R. R. Co., 99 Ky., 61, gives a clear statement of the protection the carrier owes to passengers:

"Carriers are not held to be the insurers of the absolute safety of their passengers or of their entire immunity from the misconduct of fellow passengers or of strangers; but there is an implied obligation growing out of the contract between the carrier and the passenger that the former shall afford to the latter reasonable protection and immunity from the insults, violence and wanton interference of intruders, fellow passengers and the carrier and his servants. (Winnegar's Admr. v. Central Passenger Ry. Co., 85 Ky. Rep., 553; Sherley, Etc. v. Billings, 8 Bush, 147.)

"Out of this obligation, and the doctrine that carriers of passengers are required to use the utmost care in

management of their trains in order to prevent or avoid injury to their passengers, arises the rule that makes it the duty of carriers to exercise the highest practicable degree of care and diligence in protecting and guarding their passengers from violence and assaults from whatever source, which may be reasonably anticipated or naturally expected to occur under the circumstances of the case and the condition of the parties; and if this duty is neglected or, without good cause, omitted by the carrier or his servant, the carrier will be held responsible for any injury to a passenger resulting from such neglect or omission, and which, but for same, might have reasonably been foreseen and prevented. These principles, it seems, are recognized and enforced by an almost unbroken line of decisions in this country.''

But all the cases to which our attention has been called where a passenger has been allowed to recover for injury inflicted upon him by a fellow passenger, trespasser, or intruder, arise from circumstancse or altercations originating on the car or property of the carrier, that is, in places where the carrier or its servants have such control over the parties as to make the failure to exercise such control a matter of negligence.

Appellant says that plaintiff could have avoided the injury by running away from the rowdies before the car came. But he had a right to wait for the car, and he had a right to become a passenger. However, when he became a passenger, appellant only assumed the burden of protecting him as a passenger. If in becoming a passenger he carried a difficulty with him, he cannot burden appellant with that unless appellant knew of it and accepted him as a passenger notwithstanding.

The conductor was confronted with uncertain if not conflicting duties. He stopped his car unwittingly, in the middle of a difficulty going on in the street, and the place of difficulty was almost immediately transferred to his car. During the course of it and after plaintiff boarded the car, he was struck by a missile which it seems was hurled by someone without. What could the conductor have done in the exercise of ordinary or the highest degree of care to prevent the injury? He might have moved his car out of the danger zone, but by moving the car he might have injured passengers or trespassers whom he saw on the rear steps. Was it not a safer plan to hold his car until the trespassers were expelled? It certainly cannot be maintained that he

was guilty of any wrong, or violated any duty which he owed to oncoming passengers in so handling his car, and unless he was so guilty they have no right of recovery, although injured during the time.

In this case it is immaterial that passengers requested the conductor to move his car. His duty was not in anywise altered or changed by those requests. If there was negligence in failing to move the car, it existed independently of any requests, nor did the requests enhance the degree of it. No one contends that the conductor or motorman had knowledge of the difficulty before the car reached the point, and after that time there is no pretense that any one remained in ignorance of it. Consequently advice or suggestion from passengers as to what the conductor should or should not do, could not affect the liability.

Advice, requests, or suggestions to those upon whom a duty is imposed, merely go to carry knowledge of the danger. In cases where one's peril is seen or notice is given of it, of course it becomes the duty of those in charge to avert it if possible.

No such case is here presented. Believing there was no evidence of negligence on the part of appellant, a peremptory instruction should have been given, and the case is reversed for that reason.