September 29, 1978

**78-54   MEMORANDUM OPINION FOR THE ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION**

**Federal Aviation Administration—Federal Bureau of Investigation—Air Transportation Security (49 U.S.C. § 1357(e))—Management of Aircraft Hijacking (49 U.S.C. § 1472(o))**

This is in response to your inquiry for our views on several questions in connection with the management of a commercial aircraft hijacking. You informed us that the Federal Aviation Administration (FAA) is authorized to direct the management of a hijacking situation while an aircraft is in flight. 49 U.S.C. § 1357(e).[1] The Federal Bureau of Investigation (FBI) is responsible under 49 U.S.C. § 1472(o) for the remaining aspects of the management of a hijacking by the Federal Government. You ask the following specific questions about the tort liability of the United States and a·commercial air carrier arising from the activity of these Federal agencies once an aircraft has been hijacked.

1. Assuming either some specific legislative authority or inherent power exists—

   (a) is an air carrier liable for the actions of the U. S. Government taken with the consent and/or cooperation of an air carrier during an aircraft hijacking in progress?

   (b) is an air carrier liable for the actions taken by the U.S. Government without the consent and/or cooperation of an air carrier during an aircraft hijacking in progress?

2. Does the FBI and/or the FAA, either under question 1(a) or 1(b) above, have any authority to enter into a hold harmless agreement or otherwise make certain commitments which may legally bind the U.S. Government?

3. Is the U.S. Government liable for governmental action taken—

   (a) with the consent and/or cooperation of the air carrier during an aircraft hijacking in progress?

   (b) without the consent and/or cooperation of the air carrier during an aircraft hijacking in progress?

·We answer in sequence.

---

[1] An aircraft is "in flight" from the time the last door is closed after embarkation until the first door is opened for disembarkation. 49 U.S.C. § 1357(e)(3). Under the FAA/FBI Memorandum of Understanding, the FAA determines whether or not an aircraft is "in flight" under this definition.

## I. Carrier Liability

The initial issue concerns the liability of the carrier for actions of the United States in the management of a hijacking, whether taken with or without the consent of the carrier. Significant difference exists in the liability of the carrier for domestic and international air transportation.

A carrier's liability for personal injury occurring in international air transportation to, from, or through the United States is governed by the Warsaw Convention,[2] as modified by the Montreal Agreement.[3] In essence, these two international agreements provide that the carrier is liable up to $75,000 per person, absent negligence, for death or bodily injury on board an aircraft or in the process of embarking or disembarking.[4] It has been uniformly held that an "accident" imposing liability within the meaning of the Warsaw Convention extends to the intentional acts of third parties, including hijacking and sabotage.[5] While the courts have split on the issue, district courts in New York and California have held that the Convention permits recovery for mental distress caused by a hijacking regardless of physical injury.[6] Thus, a carrier would be strictly liable to a passenger covered by the Warsaw Convention[7] for no more than $75,000, irrespective of fault. Its consent or lack of consent to acts of Federal employees would not affect this liability.

The liability of a carrier to a passenger not covered by the Warsaw Convention is a matter of State tort law.[8] Because we are aware of no reported cases involving the management of a domestic hijacking,[9] we can only state those general principles of tort law that would apply to a carrier in responding to the criminal act of a third person. As a general rule, a common carrier, including an air carrier, has a common law duty to use the highest degree of

---

[2] 49 Stat. 3000, 49 U.S.C. § 1502 note.

[3] Agreement CAB 18900 (May 13, 1966), 49 U.S.C. § 1502 note.

[4] *See, Husserl* v. *Swiss Air Transport Co.*, 351 F. Supp. 702 (S.D.N.Y. 1972), *aff'd*, 485 F. (2d) 1240 (2d Cir. 1974); *Rosman* v. *TWA*, 34 N.Y. 2d 385, 314 N.E. 2d 848 (1974).

[5] *E.g., Reed* v. *Wiser*, 555 F. (2d) 1079 (2d Cir. 1977); *Krystal* v. *BOAC*, 403 F. Supp. 1322 (C.D. Cal. 1975); *Evangelinos* v. *TWA*, 396 F. Supp. 95 (E.D.Pa. 1975); *Husserl* v. *Swiss Air Transport Co.*, 351 F. Supp. 702 (S.D. N.Y. 1972), *aff'd*, 485 F. (2d) 1240 (2d Cir. 1973).

[6] *Krystal* v. *BOAC*, 403 F. Supp. 1322 (C.D. Cal. 1975); *Husserl* v. *Swiss Air Transport Co.*, 388 F. Supp. 1238 (S.D.N.Y. 1975); *Contra, Burnett* v. *TWA*, 368 F. Supp. 1152 (D.N.M. 1973); *Rosman* v. *TWA*, 34 N.Y. 2d 385, 314 N.E. 2d 848 (1974).

[7] We note that under Article I(3) of the Warsaw Convention, a flight entirely within the United States may be subject to the Convention if the carrier and passenger regard it as part of a single, undivided international transportation. A passenger on a domestic flight with a through ticket connecting with an international flight would come under the Convention while other passengers on the flight would be covered by domestic law. *See generally* 1 Kreindler, *Aircraft Accident Law* 361-63.

[8] *See, e.g., Gatenby* v. *Altoona Aviation Corp.*, 407 F. (2d) 443 (3d Cir. 1968); *United Air Lines* v. *Wiener*, 335 F. (2d) 379 (9th Cir. 1964); *Garrett* v. *American Air Lines*, 332 F. (2d) 939 (5th Cir. 1964).

[9] We have identified only one case concerning a hijacking not covered by the Warsaw Convention which involved the carrier's alleged negligence in preventing the incident. The case was dismissed on the ground that plaintiff's injuries were not proximately caused by the hijacking. *Edwards* v. *National Air Lines*, 336 So. 2d 545 (Fla. 1976).

care in protecting its passengers from injury,[10] such as the duty to take reasonable action to defend passengers after it has been notified that an assault is occurring.[11] What would be reasonable action in response to such an assault depends on the particular facts of the case, and at least one commentator indicated that the carrier's employees have a duty to refrain from any action that reasonably may provoke greater violence or expose passengers to greater risk of harm.[12] In the light of the high standard of prescribed care imposed upon common carriers, we may argue that an air carrier could be liable for those of its actions during a hijacking which unreasonably increased the risk of harm to the passengers.

Assuming that the carrier is liable for negligent mishandling of a hijacking, the question presented is how the actions of the United States would affect that liability. As a rule, the carrier would not be liable for independent Government action which it did not request and has no power to prevent.[13] When the Government acts in conjunction with the carrier, however, the matter is more complex.

Several cases involve the negligence of a person acting under the command of a law enforcement officer to render assistance in apprehending a criminal. At common law, and by statute in many States, an individual is obliged to obey a law enforcement officer's request for assistance.[14] However, it appears that an individual assisting a law enforcement officer is still required to exercise the due care appropriate to the circumstances.[15] Thus, in *Jones* v. *Melvin*, it was held that a driver engaged in pursuit under the direction of a police officer was

[10]*See, e.g., Catenby* v. *Altoona Aviation Corp.* 407 F. (2d) 443 (3d Cir. 1968); *United Air Lines* v. *Wiener*, 335 F. (2d) 379 (9th Cir. 1964). *See generally* 8 Am. Jur. "Aviation" § 68, at 689-691; Abramovsky, Compensation for Passengers of Hijacked Aircraft, 21 Buffalo L. Rev. 339, 344-45 (1972).

[11]*See, e.g., Hanback* v. *Seaboard Coastline Railroad*, 396 F. Supp. 80 (D.S.C. 1975). *See generally* Restatement, Torts 2d § 314A(1)(a); 14 Am. Jur. "Carriers" § 1067, at 492 n. 8; *id.*, § 1072, at 496-97.

[12]*See* Note, Aircraft Hijacking; Criminal and Civil Aspects, 22 U. Fla. L. Rev. 72, 96 (1969); *cf., Louisville Ry. Co.* v. *Dott*, 161 Ky. 759, 171 S.W. 438 (1914); *Miller* v. *Mills*, 257 S.W. 2d 520 (Ky. App. 1953).

There are a number of cases in the related area of injury to business invitees in the course of an armed robbery. The courts have split on whether it is reasonable under the circumstances for a storekeeper to use force against a robber or to summon the police when the merchant's action results in injury to a customer. *Compare, Genovay* v. *Fox*, 29 N.J. 436, 149 A. 2d 212 (1959); *Yingst* v. *Pratt*, 139 Ind. App. 695, 220 N.E. 2d 276 (1966); *Helms* v. *Harris*, 281 S.W. 2d 770 (Tex. Civ. App. 1955) with *Kelly* v. *Kroger Co.*, 484 F. (2d) 1362 (10 Cir. 1973). In the *Kelly* case, the court held that it was a question for a jury to decide whether a store manager was negligent in summoning the police by a silent alarm, resulting in a gun battle that killed a customer.

We also note a few cases where bank customers have been injured when employees refuse to obey a robber's instructions. These have held that the employees acted reasonably in not obeying a criminal demand, even when the robber directly threatened a customer. *Boyd* v. *Racine Currency Exchange, Inc.*, 56 Ill. 2d 95, 306 N.E. 2d 39 (1974); *Noll* v. *Marian*, 347 Pa. 213 (1943).

[13]*Northern Railway Co.* v. *Page*, 274 U.S. 65, 74-75 (1927); *England* v. *Kinney*, 272 Ky. 33, 113 S.W. 2d 838 (1938).

[14]*See, generally, United States* v. *New York Telephone Co.*, 434 U.S. 159, 175 N. 24 (1977); *Babington* v. *Yellow Taxi Corp.*, 250 N.Y. 14, 164 N.E. 726 (1928).

[15]*Jones* v. *Melvin*, 199 N.E. 392 (Mass. 1936). *See also, Balinovic* v. *Star Evening Newspaper Co.*, 133 F. (2d) 505, 507 (Rutledge, J. dissenting); *Babington* v. *Yellow Taxi Corp.*, 250 N.Y. 14, 16, 164 N.E. 726, 727 (1928) (dictum).

negligent because he operated the vehicle at a faster speed than his ability to maintain control. We are aware of no common law authority excusing an individual's negligence, even when acting under the direction of law enforcement officers.[16]

Federal law governing the operation of aircraft has reaffirmed this principle. As a general rule, the pilot in command of an aircraft is the final authority for its operation, and instructions from Government air traffic controllers do not relieve him of his responsibility.[17] In 1974, Congress enacted 49 U.S.C. § 1357(e)(2), which provides that the FAA "shall have exclusive responsibility for the direction of any law enforcement activity affecting the safety of persons aboard aircraft in flight" involved in a hijacking.[18] The legislative history expressly allocates responsibility between the FAA and FBI but does not change the paramount authority of the pilot. Representative Kuykendall, the manager of the bill in the House, explained it to the House as follows:

> The gentleman . . . has asked possibly one of the most important questions we have discussed in this bill. That is actually, not so much what the jurisdiction of the FBI and FAA may be, but what the jurisdiction of the air crew is . . . .. [W]e decided that the pilot—from the moment he boards the aircraft until the moment he departs, is in charge. The passengers or the crew may be gone during this period.
>
> This is in the report, it is not in the law, but unless the ground forces have reason to know that this pilot is disabled and is unable to operate the aircraft, then he is in charge and the aircraft cannot be disabled from outside unless permission is given.[19]

Similarly, the Senate committee report states:

> Finally, of course, the aircraft commander is the person who must acquiesce to the hijacker in the execution of his demands. We are concerned that in some instances the aircraft commander has not been consulted or been given an opportunity to make input into decisions being made on how to deal with a hijacking in progress . . . .. The aircraft commander must not be ignored because, as is usually the case, the ultimate safety of all aboard during a hijacking incident is dependent upon the skill, courage, and decisions of the aircraft commander.[20]

Thus, Federal law enforcement officials were not authorized to direct the pilot in command in the management of a hijacking. While they may request or

---

[16]Actions which could ordinarily be considered negligence may be found to be consistent with due care in assisting law enforcement officers. *See, Babington* v. *Yellow Taxi Corp.*, 250 N.Y. 14, 16, 164 N.E. 726, 727 (1928) (dictum), depending on the facts of the particular case.

[17]14 CFR § 91.3(a), *see, e.g., American Airlines* v. *United States*, 418 F. (2d) 180 (5th Cir. 1969); *Spaulding* v. *United States*, 455 F. (2d) 222 (9th Cir. 1972); *In re Air Crash Disaster at New Orleans (Moisant Field)*, 422 F. Supp. 1166 (M.D. Tenn. 1975), *aff'd*, 544 F. (2d) 270 (6th Cir. 1976).

[18]An aircraft is "in flight" from the time when all external doors are closed after embarkation until "one such door is opened for disembarkation." 49 U.S.C. § 1357(e)(3). *See* note 1, *supra*.

[19]120 Cong. Rec. 6521 (1974), *see* H. Rept. 93-885, 93rd Cong., 2d sess., at 23.

[20]S. Rept. 93-13, 93rd Cong., 1st sess., at 20.

advise that he should take action, final decisionmaking remains with him. Under general principles of *respondeat superior,* the carrier would be liable for any negligent decision he makes.

A carrier, therefore, would be strictly liable for up to $75,000 in damages per person for injuries in a hijacking, covered by the Warsaw Convention, regardless of the actions of the United States. To persons not covered by the Warsaw Convention, the carrier would be liable for its own negligence in the handling of a hijacking. While the carrier and its employees may have a legal duty to cooperate with Federal law enforcement officials in managing a hijacking, the available case law indicates that the carrier would nevertheless be liable for negligence in the course of such cooperation. The legislative history of 49 U.S.C. § 1357(e)(2) clearly reserves final authority to the pilot in command, and the advice or suggestions of Federal law enforcement officials would not relieve the carrier of liability for the pilot's negligence.

## II. Indemnity Agreements

You further inquire whether the FAA or the FBI has authority to indemnify a carrier for its liability in connection with the management of a hijacking incident. We conclude that, with certain limited exceptions, they do not.

While the Constitution does not preclude the Government from entering into an indemnity contract, the Anti-Deficiency Act, R.S. § 3732, 41 U.S.C. § 11, prohibits a contractual arrangement by the Government "unless the same is authorized by law or is under an appropriation adequate to its fulfillment." A general contract of indemnity, by its nature, would obligate the Government to pay an indefinite sum in the event that a hijacking incident resulted in widespread personal injury or property damage. The Comptroller General has ruled that indemnity agreements of this type are void[21] unless authorized by an express statute. We have been unable to find any statute that would specifically authorize the FBI or FAA to enter into an open-ended indemnity agreement.

However, an indemnity agreement for a specific sum may be authorized by an agency's general appropriation. The Comptroller General upheld the validity of indemnity clauses in which the potential liability of the United States was limited to a specific amount not exceeding the available appropriation.[22] The rationale is that a general appropriation is available for any expense reasonably necessary to accomplish its purpose, unless prohibited by law. Since the indemnity in question would be for a definite sum not exceeding the appropriation, it is permitted by 41 U.S.C. § 11 as being under "an appropriation adequate for its fulfillment."[23] The general appropriations for the FAA and FBI would be available if it were necessary to obtain the cooperation of a carrier in the management of a hijacking.[24]

---

[21] 35 Comp. Gen. 85; 16 Comp. Gen. 803; 8 Comp. Gen. 647; 7 Comp. Gen. 507.

[22] *See* 54 Comp. Gen. 824; 42 Comp. Gen. 708.

[23] *See* 42 Comp. Gen. 708, 709.

[24] *See* 49 U.S.C. §§ 1357(e), 1472(o); Department of Transportation Appropriation Act, 1978, 91 Stat. 404; Department of Justice Appropriation Act, 1978, 91 Stat. 425; *cf.* 42 Comp. Gen. 708, 709.

We note, however, that 31 U.S.C. § 665(a) places two further restrictions on a permissible indemnity agreement. The agreement, in addition to being limited to a definite maximum, must provide (1) that only the amount of appropriated funds actually available at the time of loss will be paid, and (2) that it creates no obligation to appropriate additional funds.[25] Therefore, the FAA or FBI may indemnify a carrier only for the lesser of a definite amount within their general appropriations or the funds actually on hand at the time of a loss.

### III. Liability of the United States

Your third question is whether the United States would be liable for any Government action taken in the management of a hijacking, either with or without the concurrence of the carrier. This resolves itself into two separate problems: direct tort liability for personal injury or property damage and liability to the carrier for contribution or indemnity as a joint tortfeasor.

Absent any agreement with the carrier, liability of the United States would be governed by the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80. Under the Act, the United States is liable for the negligence of its employees in the same manner as a private person according to the law of the State where the negligent act or omission occurred, unless it has retained its sovereign immunity under one of the exceptions in 28 U.S.C. § 2680. *See, Laird* v. *Nelms,* 406 U.S. 797 (1972); *Richards* v. *United States,* 369 U.S. 1, 11 (1962); *Rayonier, Inc.* v. *United States,* 352 U.S. 315, 319 (1957). Thus, the issues in any tort claim against the United States arising from managing a hijacking would be, first, has the Government retained its sovereign immunity and, if not, did it show due care in the handling of the incident?

Sovereign immunity is retained by 28 U.S.C. § 2680(a) for:

> Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

In *Dalehite* v. *United States,* 346 U.S. 15, 35 (1953), the Supreme Court defined the "discretionary function" exception to include "initiation of programs or activities" and also "determinations made by executives or administrators in establishing plans, specifications, or schedules of operation." The boundary drawn by the exception is between "decisions made at a planning rather than at an operational level." *Id.,* at 42. The Court clarified this decision in *Indian Towing Co.* v. *United States,* 350 U.S. 61, 69 (1955), and *Rayonier, Inc.* v. *United States,* 352 U.S. 315, 318 (1957), by holding the Government liable for its negligent conduct. However, the line between "policy" and "operational" levels of decisionmaking is not clear, and the courts tend to resolve doubts in favor of liability.[26]

---

[25]54 Comp. Gen. 824.

[26]*See, e.g., Driscoll* v. *United States,* 525 F. (2d) 136, 139 (9th Cir. 1975); *Downs* v. *United States,* 522 F. (2d) 990, (6th Cir. 1975).

In the conduct of law enforcement activities, the mere exercise of judgment by a Federal officer does not invoke the discretionary-function exception. The courts have distinguished between policy and operational decisions in law enforcement on the basis of several related factors: the status and authority of the individual making the decision, the existence of regulations or guidelines governing his actions, and the precedential effect his decision would have for other law enforcement officers. Thus, decisions made by Cabinet and sub-Cabinet level officers that a particular situation warranted the use of force to suppress disorder have been held to be matters of policy.[27] Similarly, a decision by subordinate officials to use force in accordance with policy determined at a higher level is within the discretionary-function exception.[28] In contrast, *Downs* v. *United States,* 522 F. (2d) 990, 998 (6th Cir. 1975), held that a decision by an FBI Assistant Special Agent in Charge to use force rather than outwait a hijacker was operational in nature. The court found it significant that the agent acted contrary to written FBI policy. It distinguished the cases arising out of the disorders at the University of Mississippi[29] on the ground that the decision to use force there was an "exemplary" one made by the Deputy Attorney General in a relatively unprecedented situation that "was meant to influence and did inevitably guide the actions of other government officials faced with similar situations." 522 F. (2d) at 998.

Based on these decisions, we believe that the United States would not be liable for negligence in the formulation of general policy for the management of hijackings, including, for example, the circumstances in which force may be used, the circumstances in which a hijacker's demands should be met, and the relative importance of capturing the hijacker and protecting the safety of innocent persons. Written instructions for general guidance fall clearly within the discretionary-function exception. *Ad hoc* decisions and interpretation of written policy made by senior FAA or FBI officials generally responsible for hijackings or by their superiors would most likely be considered policy matters. Decisionmaking by subordinate officials, however, would more likely be considered operational so that the United States would be responsible for the negligence of these officials in their decisions in the management of a hijacking. In any case, this distinction has not been clearly established and the facts of each case would determine whether decisions were considered policy matters or were made on an operational level.

---

[27]*United States* v. *Faneca,* 332 F. (2d) 872, 874 (5th Cir. 1964) (Deputy Attorney General's decision to use tear gas to disperse a mob that was obstructing admission to the University of Mississippi); *Smith* v. *United States,* 330 F. Supp. 867, 868 (E.D. Mich. 1971) (decision by Secretaries of Defense and Army to federalize the Michigan National Guard for the 1967 Detroit riots); *cf., Monarch Ins. Co.* v. *United States,* 353 F. Supp. 1249, 1256-60 (D.D.C. 1973), *aff'd* 497 F. (2d) 684 (D.C. Cir. 1974) (decision by Secretary of the Army not to use deadly force in the 1968 District of Columbia riots).

[28]*Nichols* v. *United States,* 236 F. Supp. 60 (N.D. Miss. 1964) (use of tear gas at the University of Mississippi).

[29]*United States* v. *Faneca,* 332 F. (2d) 872 (5th Cir. 1964); *Nichols* v. *United States,* 236 F. Supp. 260 (N.D. Miss. 1964).

In a case involving "operational" decisions, the standard level of required care by FAA or FBI agents will be governed by the law of the State where the incident occurred. However, there are several elements of the opinion in *Downs* v. *United States*, 522 F. (2d) 990, 999-1003 (6th Cir. 1975), which applied Florida law in a way that may govern the application of the law in other States. The first element is that law enforcement personnel will be required to exercise the prudent judgment that an individual with the requisite special training should have.[30] Failure to follow written FBI or FAA procedures for handling these incidents will likely be considered strong evidence of negligence. Finally, the Government will be expected to maximize the safety of passengers to the extent consistent with the aim of apprehending the hijacker and resisting his unreasonable demands.[31] As the Sixth Circuit summarized the standard of care, 522 F. (2d) at 1003:

> Where one trained in the field of law enforcement is called upon to make a judgment which may result in the death of innocent persons, he is required to exercise the highest degree of care commensurate with all facts within his knowledge. Such care must be exercised in order to ensure that *undue* loss of life does not occur. [Emphasis added.]

This, we believe, means that when the life of a third party is at stake, due care will consist of trying to outwait a hijacker until he presents an imminent threat to the passengers. The facts of the particular case would determine the point at which intervention would be appropriate.

Finally, we note the possibility that both the carrier and the United States would be found negligent with respect to passengers or third persons.[32] In that event, liability for contribution or indemnity between the United States and the carrier would depend on the substantive law of the State where the negligence occurred.[33]

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[30]*See generally* Restatement, Torts 2d § 289(b), comment m.; § 299, comment f.

[31]*See generally* Restatement, Torts 2d § 292, comment c.; § 302B, comment e.

[32]*Cf., Ingham* v. *Eastern Air Lines, Inc.*, 373 F. (2d) 227 (2d Cir. 1967); *United Air Lines* v. *Wiener*, 335 F. (2d) 379 (9th Cir. 1964).

[33]*See, e.g., United States* v. *Yellow Cab Co.*, 340 U.S. 543 (1951); *Certain Underwriters at Lloyd's* v. *United States*, 511 F. (2d) 159 (5th Cir. 1975); *Ingham* v. *Eastern Air Lines, Inc.*, 373 F. (2d) 227 (2d Cir. 1967).